**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TANYA RUTNER HARTMAN** | : | **Case No. 2:20-cv-1952** |
| | : | |
| **GILDED SOCIAL, LLC** | : | **Judge Marbley** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **-vs-** | : | **MOTION FOR IMMEDIATE TEMPORARY** |
| | : | **RESTRAINING ORDER AND** |
| **OHIO DEPARTMENT OF HEALTH** | : | **PRELIMINARY INJUNCTION** |
| | : | |

*And*

**AMY ACTON**
*In her official capacity as Director of the Ohio*
*Department of Health*

**Defendant.**


> *"The rationale for granting procedural protection to an interest that does not rise to the level of a fundamental right lies at the very heart of our constitutional democracy: the prevention of arbitrary use of government power."*
>
> *-Howard v. Grinage,* 82 F.3d 1343, 1349 (6th Cir. 1996)

One state administrative official has abandoned both the lawmaking and the rulemaking processes to criminalize a broad spectrum of Ohioans' livelihoods deemed, without deliberation, "non-essential."  There is little doubt that the State of Ohio may enact policies, wise or unwise, to counteract a pandemic.  "It is the role of the judiciary, however, to ensure the protection of individual rights." *KindHearts for Charitable Humanitarian Development, Inc. v. Geithner*, 710 F.Supp.2d 637 (N.D.Ohio, 2010);  *E.g., Trop v. Dulles,* 356 U.S. 86, 103, (1958) ("The Judiciary has the duty of implementing the constitutional safeguards that protect individual rights. When the Government acts to take away [fundamental rights] ..., the safeguards of the Constitution should be examined with special diligence.").

Constitutional limits on government power cannot be removed each time public officials confront potential crises.  To the contrary, "to reduce the risk of tyranny and abuse," constitutional safeguards operate

precisely *so that* we may resist the temptation to concentrate power in one location as an expedient solution to the crises of the day." *New York v. United States,* 505 U.S. 144, at 187-188.

To that end, the State must be enjoined from enforcing its criminalization of "non-essential business" in the absence of the meaningful post-deprivation relief - - a hearing where it carries its burden of proving that the businesses of Plaintiffs and/or others are in fact non-essential and unsafe - - required by the Fifth and Fourteenth Amendment to the United States Constitution.  Even if prohibiting non-essential businesses were otherwise tolerable, doing so *without Due Process* is neither necessary nor constitutionally-permissible.

## I.  Critical Background

On March 22, 2020, the Director of the Ohio Department of Health purported to impose a Director's Stay at Home Order, ordering that, "non-essential businesses and operations must cease," and "effective at 11:59pm on March 23, 2020, all persons are to stay at home or their place of residence unless they are engaged in Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations as set forth in this Order."   Doc.1-1.  Rather than defining the category articulated as "Essential Businesses and Operations," the Director attempts to name "essential businesses and operations" over the course of three pages and 25 paragraphs.  *Id.*  While the standard of "essentiality" may initially appear clear, i.e. "necessary for survival," this list includes, amongst other things, liquor, marijuana, dry cleaners, and the state lottery.  *Id.*   The Order further purports to require these essential businesses and operations to "take proactive measures to ensure compliance with Social Distancing Requirements," such as attempting to maintain "six-foot distances" from others and providing hand sanitizer and sanitizing products.  *Id.*

On April 2, 2020, the Director renewed this Order, with only minor modifications ("Amended Director's Stay at Home Order").  The Amended Order clarifies the State's intent to rely upon R.C. 3701.352 to punish any violation of "any order the director or department of health issues" with subjection to "a misdemeanor of the second degree, which can include a fine of not more than $750 or not more than 90 days in jail, or both."  *Id.*

2

The Amended Order further provides for "Dispute Resolution." *Id*. However, the Dispute Resolution Commission is (1) limited to reviewing situations where "any local health department issues a determination under Section 17 of this Order that is in conflict with a determination issued by a different local health department;" (2) appointed solely by the Director of Health; (3) immune from any right to judicial review, as "the decision of the Dispute Resolution Commission *shall be final*;" and (4) without instruction as to how to allocate the burden of proof. *Id.*

Applying this new power, the Dispute Resolution Commission has clarified that local health departments are limited to answering questions regarding the Order solely "if a public official enforcing the Order has questions." *Id.* In doing so the Commission, without hearings, has issued a series of copied-and-pasted two-page orders, typically varying from one another by only one sentence. Doc. 1-2. In one such order, the Commission determined that "businesses providing car washing services are essential if operating within the following parameters: 1) employees have no direct interactions with customers; 2) employees do not hand-wash or hand-dry vehicles; 3) employees maintain social distancing and comply with the other requirements outlined in the order; and 4) the number of employees is limited to only those necessary to operate the business within these parameters." Doc. 1-2.

Each order deems "weddings" essential. Doc. 1-1.

Plaintiff Gilded Social is, since 2017, a "special order dress shop in downtown Columbus," specializing in dresses for brides and bridesmaids. Doc. 1. The Spring is Plaintiffs' busiest season, as brides and bridesmaids prepare for summer and fall weddings. As a direct result of the Director's Orders, Plaintiffs' retail store, like so many other Ohio businesses, has been physically closed for 23 days during this critical time period, and now face potential permanent closure if not immediately permitted to open to the public while complying with the Order's Social Distancing Requirements. In addition, Gilded Social sews fabric masks that can be used by employees and customers and sold to the general public. Doc. 1.

If granted a hearing on the matter, the State would quite likely be unable to prove that Gilded Social is both "non-essential" and unsafe. To that end, Plaintiffs sought such a hearing. Doc. 1-3. In response,

Plaintiffs' local health department denied any such opportunity, indicating that it "does not determine if a business is essential or not," and businesses must instead "read the order" and "use their best judgment." Doc. ___.    The state likewise denied any such opportunity, explaining that "There must be an existing conflict between jurisdictions.  I am unsure of another process to help you at this time."  Doc. ____.

## II.  Law and Analysis

In determining whether to grant the present motion the Court is to consider four factors:  (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether the issuance of a temporary restraining order or preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of a temporary restraining order or preliminary injunction.  *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997).  These factors are to be *balanced* against one another and should not be considered prerequisites to the granting of a temporary restraining order or preliminary injunction.  *See United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.,* 163 F.3d 341, 347 (6th Cir. 1998).  This balance of interests weighs strongly in favor of the Plaintiffs and the granting of the present motion, because Plaintiffs are likely to prevail on the merits and face the irreparable harm of <u>criminal prosecution and extensive fines</u>.

### A.  Plaintiffs are likely to prevail on the merits of their Due Process claim.

The Due Process Clause of the Fourteenth Amendment provides that "no State shall ... deprive any person of life, liberty, or property without due process of law."  The Clause "was intended to prevent government from abusing its power, or employing it as an instrument of oppression." *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 196 (1989) (internal citations and quotations omitted). "No clause in our nation's Constitution has as ancient a pedigree as the guarantee," and "[s]ince the Fifth Amendment's ratification, one theme above all others has dominated the Supreme Court's interpretation of the Due Process Clause: fairness." *Ass'n of Am. Railroads v. U.S. Dep't of Transp.,* 821 F.3d 19, 31 (D.C.

Cir. 2016), citing *Snyder v. Com. of Mass.,* 291 U.S. 97, 116, (1934) (Cardozo, J.) ("Due process of law requires that the proceedings shall be fair . . . with reference to particular conditions or particular results.").

"A procedural due process limitation, unlike its substantive counterpart, does not require that the government refrain from making a substantive choice to infringe upon a person's life, liberty, or property interest. It simply requires that the government provide 'due process' before making such a decision. The goal is to minimize the risk of substantive error, to assure fairness in the decision-making process, and to assure that the individual affected has a participatory role in the process. The touchstone of procedural due process is the fundamental requirement that an individual be given the opportunity to be heard 'in a meaningful manner.'" *Howard v. Grinage,* 82 F.3d 1343, 1349 (6th Cir. 1996), citing *Loudermill v. Cleveland Bd. of Educ.,* 721 F.2d 550, 563 (6th Cir.1983), *aff'd,* 470 U.S. 532, 105 S.Ct. 1487 (1985).

To this end, "there is no dispute that *never* providing an opportunity to challenge a permit revocation violates due process. Thus, the revocation of [the right to remain in business] without a pre-deprivation hearing or a post-deprivation hearing violated due process." *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 488 (6th Cir. 2014).  Even when such property interests are deprived in an "emergency situation," government must provide an "adequate post-deprivation process." *United Pet Supply*, 768 F.3d at 486.

These safeguards for liberty are so beyond objection that "[n]o reasonable officer could believe that revoking a permit to do business without providing any pre-deprivation or post-deprivation remedy [is] constitutional." *Id.,* at 488.  Thus, in the words of binding Sixth Circuit precedent, putting an Ohioan out of business without any opportunity for a hearing "is one of the rare situations where the unconstitutionality of the application of a statute to a situation is plainly obvious" such that "a clearly established right" is violated, and even qualified immunity is to be denied. *Id.,* at 489.

Nevertheless, the Ohio Department of Health has entirely ignored these clear and important safeguards in imposing its "Stay at Home Order" indefinitely closing "non-essential businesses," even

though the Orders have been renewed and carried on for nearly 30 days now, and even though county health departments alone have been privileged to receive hearings.  It must be enjoined from continuing to do so.

    **i.    Forcing closure of Ohioans' businesses requires Due Process.**

Interests in operating a business or earning a living are more than sufficient to invoke procedural due process guarantees.  *Johnson v. Morales*, 946 F.3d 911, 935–37 (6th Cir. 2020)("Johnson's interest in her business license is enough to invoke due process protection"); *United Pet Supply, Inc. v. City of Chattanooga,* 768 F.3d 464, 486 (6th Cir. 2014); *Eastwood Mall, Inc. v. Slanco,* 1994-Ohio-433, 68 Ohio St. 3d 221, 223 ("the right to do business and the right to labor freely and without restraint are all constitutional rights equally sacred").  This Circuit recently acknowledged that "the Supreme Court has long recognized that an individual may have a significant interest in maintaining a license to do business." *Id.,* citing e.g., *Bell v. Burson*, 402 U.S. 535, 539 (1971) ("Once licenses are issued ... their continued possession may become essential in the pursuit of a livelihood . . . In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."); *Freeman v. Blair*, 862 F.2d 1330, 1332 (8th Cir. 1988) (holding that the summary suspension of a business license violated due process, "especially in view of the fact that defendants have made no showing that a predeprivation hearing was impracticable or impossible").

More generally, the Court has "repeatedly recognized the severity of depriving someone of his or her livelihood." *FDIC v. Mallen*, 486 U.S. 230, 243, 108 S.Ct. 1780 (1988); see also *Planned Parenthood Sw. Ohio Region v. Hodges,* 138 F. Supp. 3d 948, 950–61 (S.D. Ohio 2015)("Director does not dispute that PPSWO has a protected property interest.  That property interest plainly exists in the continued operation of its ASF"); *Women's Medical Professional Corp. v. Baird,* 438 F.3d 595, at 612 (6th Cir. 2006)(holding that the physician and the clinic had "a protected property interest in the continued operation of the Dayton clinic" because it "will be unable to operate its business"); *Brookpark Entm't, Inc. v. Taft*, 951 F.2d 710, 716 (6th Cir.1991) (recognizing that an Ohio liquor licensee has a property interest protected under the Due Process Clause); *Haag v. Cuyahoga Cty.,* 619 F. Supp. 262, 275–76 (N.D. Ohio 1985), aff'd, 798 F.2d 1414

(6th Cir. 1986)("While the Supreme Court has not attempted to define with exactness the liberty interests guaranteed by the Fourteenth Amendment, the term ... denotes not merely freedom from bodily restraint but also the right . . . to engage in any of the common occupations of life.").

Here, the Department of Health has ordered Plaintiffs' business to be entirely shut down for nearly one month, even though Plaintiffs have harmed nobody, broken no law, and could safely perform important societal functions. Consequently, they - - and other Ohioans like them - - maintain a liberty and property interest warranting Due Process guarantees.

> ii. **The Director's closure of "non-essential" businesses must be enjoined because it fails to provide the "process" due: entitlement to an immediate post-deprivation hearing where the state must prove its case for closure.**

The fundamental requirement of due process is the opportunity to be heard and it is an "opportunity which must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191 (1965). Applied here, precedent dictates that this entitles Plaintiffs and other Ohio businesses shut down as "non-essential" to a prompt hearing wherein the State must prove that the business is neither essential nor safe. In the absence of such safeguards, the Director's Order, insofar as it criminalizes non-essential business without a hearing, must be immediately enjoined: the risk of erroneous deprivation in the form of criminal penalties or financial ruin is simply too high.

> a. **Plaintiffs are entitled to a post-deprivation hearing.**

Under these circumstances, the Director can obviously be excused from offering a pre-deprivation hearing to "non-essential" businesses; but a swift post-deprivation hearing must nevertheless be available. "While due process generally requires predeprivation notice and an opportunity to be heard, postdeprivation process is all that is required when there is either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking." *Ctr. for Powell Crossing, LLC v. City of Powell, Ohio,* 173 F. Supp. 3d 639, 661–62 (S.D. Ohio 2016), citing *Parratt v. Taylor*, 451 U.S. 527, 539 (1981)("The prior cases which have excused the prior-

hearing requirement have rested in part on the availability of some meaningful opportunity subsequent to the initial taking for a determination of rights and liabilities."). Simply put, in such circumstances, "<u>meaningful postdeprivation remedy for the loss</u>" is the process due. *Powell Crossing*, supra., citing *Hudson v. Palmer*, 468 U.S. 517, 531–33 (1984).

*Further*, even when the "the government has a substantial interest in ensuring the safety of its citizens," a postdeprivation hearing is still required. See *Johnson v. Morales,* 946 F.3d 911, at 923 (6th Cir. 2020).

*Finally*, in requiring a postdeprivation hearing, at least with respect to the decimation of one's business and livelihood, it matters not that the deprivation may be only "temporary" in nature. The Supreme Court has held that even a brief and provisional deprivation of property pending judgment is of constitutional importance. *See Fuentes v. Shevin,* 407 U.S. 67, at 84–85 ("[I]t is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment."); *United States v. Monsanto,* 924 F.2d 1186, 1192 (2d Cir.1991) (noting that a "temporary and nonfinal" removal of a defendant's assets, "is, nonetheless, a deprivation of property subject to the constraints of due process"); *Johnson*, supra., at 935–37 ("it is unclear what difference it makes that the City suspended Johnson's license rather than revoked it. We have not found (and Defendants have not cited) any authority that explains what the formal or practical difference is between a suspended license and a revoked license."). As in *Johnson*, where the need to be open "means all or nothing for the continued operation of her southern soul food business," Plaintiffs maintain no "financial safety net while awaiting a final decision" and the need for an immediate hearing and immediate relief is paramount. *Id.*

Moreover, this allegedly "temporary" deprivation has now become sustained and substantial for Ohio businesses. *Johnson v. Morales,* 946 F.3d 911, 923 (6th Cir. 2020)("Contrary to the district court's opinion, the Supreme Court's precedents show that we measure the extent of the private interest from the time of the suspension to the time a decision has been reached in the post-suspension proceeding"); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 56, 114 S.Ct. 492 (1993) ("And even if the ultimate judicial

decision is that the claimant was an innocent owner, or that the Government lacked probable cause, this determination, coming months after the seizure, would not cure the temporary deprivation that an earlier hearing might have prevented.")

The Director's Stay at Home Orders fails to provide any post-deprivation review whatsoever, despite having been in place for over 25 days.  Accordingly, Plaintiffs have been needlessly deprived of their livelihood during that time, without an opportunity to test the State's assertions that they are "non-essential" or unsafe, or that a narrower alternative limit on their business may not suffice.

### b.  Plaintiffs are entitled to an *immediate* post-deprivation hearing.

Justice Sotomayor, then-judge, once explained that "due process of law requires that plaintiffs be afforded a *prompt* post-seizure, pre-judgment hearing before a neutral judicial or administrative officer." *Krimstock v. Kelly*, 464 F.3d 246, 255 (2d Cir. 2006)(25 day delay for post-deprivation hearing unconstitutional); see also *United States v. James Daniel Good Real Prop.,* 510 U.S. 43, at 56 (1993)(noting that where irreparable injury may result from a deprivation of property, "the Due Process Clause requires ... an opportunity for some kind of predeprivation or *prompt* post-deprivation hearing at which some showing of the probable validity of the deprivation must be made").  No governmental interest justifies a delay of several days before the government is required to establish probable cause for the detention of a [a person's] vehicle." *State v. Hochhausler,* 1996-Ohio-374, 76 Ohio St. 3d 455, 458–68.  What is true for one's automobile is equally true for one's livelihood, since many rationales for the importance of access to travel tend to rely on one's need to get to work.

The point is that "[a]t some point, a delay in the post-termination hearing would become a constitutional violation," *FDIC v. Mallen,* 486 U.S. 230, 242 (1988).  Moreover, the very significant deprivation ushered in by the State's closure of "non-essential" businesses like Plaintiffs is *ongoing*: "the constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Zinermon v. Burch,* 494 U.S. 113, 125–26 (1990); *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 547 (1985), citing *Barry v. Barchi,* 443 U.S. 55,

at 66 (1979)("[I]t was necessary that Barchi be assured a prompt postsuspension hearing, one that would proceed and be concluded without appreciable delay. Because the statute as applied in this case was deficient in this respect, Barchi's suspension was constitutionally infirm under the Due Process Clause of the Fourteenth Amendment").

In this matter, after nearly 30 days without any Due Process whatsoever, despite a Renewed Stay at Home Order that provides such hearings for health department officials *only,* that day has long-since come and gone.

c. **Plaintiffs' are entitled to an immediate post-deprivation hearing where *the burden must be on the state to prove "non-essentiality" and an absence of safety*.**

Binding precedent dictates that when depriving citizens of critical rights through vague standards, it is government who must justify its deprivation of rights, rather than citizens who must prove their entitlement to those rights.  One's livelihood is just such a right; and "essentiality" is just such a standard. Yet in failing to provide any business deemed "non-essential" with any right to a hearing where the State must justify the closure of that business, the Orders fail Due Process (forcing the homeowner to prove compliance with such vague standards stacks the deck against the constitutionally-guaranteed right to run an otherwise-lawful business).

"The point of procedural due process is to 'require procedural fairness and to prohibit the state from conducting unfair or arbitrary proceedings."  *Johnson v. Morales*, 946 F.3d 911, 916–40 (6th Cir. 2020), citing *Puckett v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 606 (6th Cir. 2016) (quoting *Garcia v. Fed. Nat'l Mortg. Ass'n*, 782 F.3d 736, 740-41 (6th Cir. 2015)).  "These requirements are not satisfied simply because a hearing took place."  *Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 427 (6th Cir. 2017). Rather, courts are required to look to the "substance, not to bare form, to determine whether constitutional minimums have been honored." *Bell v. Burson*, 402 U.S. 535, 541 (1971).

To this end, "Burden-shifting can be a problem of constitutional dimension in the civil context." *Johnson v. Morales*, 946 F.3d 911, 916–40 (6th Cir. 2020).  For instance, in *Speiser v. Randall*, 357 U.S.

513, 525-26 (1958), the Court invalidated a California procedure under which *taxpayer*s had the burden of

demonstrating that they were *not* individuals who advocated the overthrow of the government in order to

qualify for tax exemptions. The Court was particularly concerned that the burden-shifting in *Speiser* led to

situations where "the possibility of mistaken factfinding" created the danger that legitimate conduct would be

penalized. 357 U.S. at 526, 78 S.Ct. 1332; see also *Western & A.R.R. v. Henderson,* 279 U.S. at 642

(1929)("[a] statute creating a presumption that is arbitrary, *or* that operates to deny a fair opportunity to repel

it, violates the due process clause of the Fourteenth Amendment. *Legislative fiat may not take the place of*

*fact in the judicial determination of issues involving life, liberty, or property*");  *Minski v. U.S.* 131 F.3d 614,

617 (6th Cir., 1942)("[t]he guaranty of the due process clause of the Fifth Amendment is, that a law shall not

be unreasonable, arbitrary or capricious, and we think that the presumptive evidence clauses of the act here

involved must fall before the constitutional inhibition").

A Sixth Circuit panel recently applied this principle in explaining that "a hearing in which the

suspension is presumed to be warranted" and the property owner "bore the burden to prove the opposite" is

one that "fails to provide the meaningful procedure mandated by due process":

> **By depriving her of a hearing and requiring her to bear the burden of proving that her**
> **business was not a threat to the public health, morals, safety, or welfare, the ordinance**
> **created a situation where Johnson's vested property interest in her business license could be**
> **revoked without any proof, but reinstated only if Johnson proved that her business was not a**
> **danger to the health, morals, safety, or welfare, of the city; and that such a system unfairly**
> **jeopardized Johnson's property interest in her means of livelihood, an interest that this court**
> **and the Supreme Court have recognized as "one of the most significant that an individual can**
> **possess."  Given the nature of the right involved, <u>a post-deprivation hearing in which the</u>**
> **<u>suspension is presumed to be warranted and Johnson bore the burden to prove the opposite</u>**
> **<u>fails to provide the meaningful procedure mandated by due process.</u>**

*Johnson v. Morales*, 946 F.3d 911, 935–37 (6th Cir. 2020) (Here, the fact-laden nature of the inquiry and the

generality of a standard based on 'the interest of the public health, morals, safety, or welfare' make it

plausible that placing the burden of persuasion on Johnson impermissibly heightened 'the possibility of

mistaken factfinding' and created the danger that her valid property interest in her business was illegitimately

jeopardized"), citing *Ramsey v. Bd. of Educ. of Whitley Cty.*, 844 F.2d 1268, 1273 (6th Cir. 1988) and

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985); see also *Krimstock v. Kelly*, 464 F.3d 246, 255 (2d Cir. 2006)("plaintiffs have a right under the Fourteenth Amendment to ask what "justification" the City has for retention of their vehicles during the pendency of proceedings, and to put that question to the City at an early point after seizure in order to minimize any arbitrary or mistaken encroachment upon plaintiffs' use and possession of their property.").

Here, the Director's Order sets forth a standard, "essentiality," that virtually all or no profitable businesses meet, since the Order clearly interprets and applies that term to include many businesses that are not merely "essential to human survival," such as car washes, dry-cleaners, the state lottery, and all liquor sellers. Even further confounding, the Director uses considerations of safety to inform essentiality. In light of such standardless standards, any deprivation hearing afforded to Plaintiffs or other "non-essential businesses" that is limited to allowing *them* to show cause why they should *not* be shut down would continue to violate Plaintiffs' right to Due Process. And due to this deficiency, both independently and when compounded alongside the vagueness and delegation problems inherent in the Director's Orders, Plaintiffs are likely to succeed on the merits of their Due Process claim. See *Krimstock v. Kelly,* 306 F.3d 40, at 69-70 (2d Cir. 2002)("At a minimum, the hearing must enable claimants to test the probable validity of continued deprivation . . . Inasmuch as the purpose of the hearing is the limited one of determining whether the vehicle should be returned to its owner during the pendency of proceedings, due process should be satisfied by an initial testing of the merits of the City's case. In addition, the retention hearing will allow the court to consider whether less drastic measures than continued impoundment, such as a bond or a restraining order, would protect the City's interest in the allegedly forfeitable vehicle during the pendency of proceedings.")

### iii. As neither "statutes" nor "rules," no deference is owed to the Director's Orders.

The current circumstance fails to warrant suspension of Procedural Due Process. To the contrary, the doctrine of deference arises to afford breathing space to those elected to represent the public will. Here, rather than arising from the democratic process, the Director's Order arises from unilateral and unchecked power inconsistent with statutory lawmaking, administrative rulemaking.

*First,* the Orders are not statutes enacted by elected representatives.  As such, the orders have not endured subjection to a deliberative legislative process (which includes committee hearings).

*Moreover,* "the legislative power of the state is vested in the General Assembly by Section 1, Article II of the Ohio Constitution, and it may not transfer these vested legislative functions unless it has provided sufficient standards within which a board or administrative agency may make subordinate rules." *State ex rel. Huntington Ins. Agency, Inc. v. Duryee,* 1995-Ohio-337, 73 Ohio St. 3d 530, 535, citing *Belden v. Union Cent. Life Ins. Co.* (1944), 143 Ohio St. 329, paragraphs one and three of the syllabus; *Princeton City School Dist. Bd. of Edn. v. Ohio State Bd. of Edn.* (1994), 96 Ohio App.3d 558.  Put otherwise, "[t]he General Assembly cannot delegate its legislative powers to an administrative body and any such delegation would be unconstitutional." *Matz v. J.L. Curtis Cartage Co.* (1937), 132 Ohio St. 271. "However, the legislature may pass laws which delegate *administrative* powers to an administrative body." *Id.*

Classification of businesses as "non-essential," followed by criminalization of "non-essential" business and activity, is a legislative rather than administrative power.  This reality is unaltered by R.C. 3701.13, which purports to delegate "ultimate authority in matters of quarantine and isolation."  Indeed, "a law which confers discretion on a board without establishing any guidelines is a delegation of legislative power and is unconstitutional. *Id.,* paragraph seven of the syllabus; *Weber v. Bd. of Health* (1947), 148 Ohio St. 389, at paragraph three of the syllabus.

*Second,* even if "ultimate power" were somehow "administrative," the Director has blown past the procedural safeguards that the Ohio Supreme Court has declared to exist for the very purpose of providing Procedural Due Process to Ohioans:  to ensure adequate public participation, R.C. Chapter 119 requires, among other protections, public notice, the opportunity for public comment, and a public hearing before agency rules can be validly imposed. R.C. 119.03; *see Northeast Ohio Regional Sewer Dist.,* 58 Ohio St.3d at 24, 567 N.E.2d 993.  Indeed, Ohio's Administrative Procedures Act provides a detailed protocol for promulgating a proposed rule. That protocol, generally speaking, calls for public notice, which must include certain information, R.C. 119.03(A), electronic filing of the full text of the rule with certain public

offices, R.C. 119.03(B), submission to the Joint Committee on Agency Rule Review for its scrutiny, R.C. 119.03(C), a full public hearing, R.C. 119.03(D), and much more. The purpose of these procedures is to provide opponents of a proposed regulation the opportunity to express their views as to the wisdom of the proposal and to present evidence with respect to its legality. *Northeast Ohio Regional Sewer Dist.* at 23–24, 567 N.E.2d 993.

The Ohio Supreme Court recently explained that these Chapter 119 rulemaking procedures are "basic procedural protections." *Fairfield Cty. Bd. of Commrs. v. Nally*, 2015-Ohio-991, ¶¶ 42, 143 Ohio St. 3d 93, 104–06 ("the basic requirements of procedural due process are notice and an opportunity to be heard."). "Without R.C. Chapter 119 procedures, there is no opportunity for a party to obtain meaningful review [and] the abrogation of meaningful review . . . deprives . . . the right to notice and the opportunity to be heard provided by R.C. Chapter 119." *Id*., at ¶ 46-47 ("Ohio EPA developed binding standards to apply to the entire watershed, and the discharging sources are expected to abide by those standards. But those who will be affected have not been provided with the full panoply of rights afforded by R.C. Chapter 119. Without the benefit of the procedure prescribed by that chapter, affected persons are denied access to the process that the General Assembly intended them to have, i.e., the early, informed, and meaningful opportunity to challenge the legality of the standards established in the TMDL and the underlying assumptions, data, logic, and policy choices that Ohio EPA made in developing those standards").

In haste, perhaps warranted, the Director has either legislated without the checks of the legislative process or to made administrative rules without the checks of the administrative rulemaking process. Irrespective of which scenario, no deference is owed to such orders when they affront Ohioans' clearly-established Due Process guarantees.

Consequently, Plaintiffs are highly likely to succeed on the merits of their Due Process Claim: the State must be enjoined from enforcing its criminalization of "non-essential business" absent

providing a meaningful post-deprivation relief in the form of a hearing where it carries its burden of proving that the businesses of Plaintiffs and/or others are in fact non-essential and unsafe.

### iv. The criminalization of "non-essential business" without requisite Due Process is unconstitutional on its face.

As applied to Plaintiffs, the Director's prohibition on "non-essential business" violates Plaintiffs' Due Process rights:  Plaintiffs business is important, and it can be safely operated.  However, the only means of discerning who maintains an as-applied claim is through the production of facts specific to each "non-essential business" who desires a hearing.  And because that opportunity is denied equally to all, the criminalization of non-essential business is also inherently defective on its face.  See *City of Los Angeles, Calif. v. Patel,* 576 U.S. 409, 135 S. Ct. 2443 (2015)("Under the most exacting standard the Court has prescribed for facial challenges, a plaintiff must establish that a "law is unconstitutional in all of its applications."  But when assessing whether a statute meets this standard, the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct").  Authorizing deprivations of liberty and property without proper hearings is entirely analogous to authorizing forced searches without warrants or consent:  each assertion of government power is procedurally defective on its face.  And all Ohioans whose businesses are closed, but those that believe they can prove essentiality and safety, are denied due process.

*In Mariemont Apartment Assn. v. Vill. of Mariemont,* the court of appeals explained why prohibition and penalization of important liberty interests without the opportunity for prompt and meaningful review are void on their face:

> The failure to provide an avenue for prompt review of the governmental action would violate due process . . . We hold that the failure to provide specific times for the appeal process and a longer stay of enforcement renders this ordinance unconstitutional. The governmental interest does not outweigh the private interest and the attendant risk of the erroneous deprivation of property owners' interests in their rental businesses. The ordinance is therefore unconstitutional because it violates the Due Process Clause. Further, the lack of due process infects the entire ordinance. The unconstitutional provisions so disrupt the statutory scheme that they cannot be severed from those that are constitutional.  Consequently, we must declare the ordinance unconstitutional in toto.

2007-Ohio-173, ¶¶ 50-51; see also *Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849 (1999) (facial invalidation on Due Process Clause of the Fourteenth Amendment).  The Director's criminalization of all non-essential businesses, without a hearing, violates the Due Process rights of all such businesses.

**B.  Plaintiff is confronted with irreparable injury.**

A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages.  *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir.1992).  Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights. *See, e.g., Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir.1998) (recognizing that the loss of First Amendment rights, for even a minimal period of time, constitutes irreparable harm).

Meanwhile, satisfaction of the first prong of the preliminary injunction standard – demonstrating a strong likelihood of success on the merits – also satisfies the irreparable injury standard.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1973) (holding that if a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated).

Further, "the inability to operate an ongoing business for an unknown period of time constitutes irreparable harm that cannot be fully compensated by monetary damages." *See Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1382 (6th Cir.1995). Moreover, Plaintiffs here like so many other Ohioans, face a precipice:  untenable decimation of their life's work, or severe criminal penalties that entail up to 150 days in prison.  Either poison is classically "irreparable."

**C.  No public interest is served by stripping Ohioans of Due Process, nor would private harm accrue if Plaintiffs were granted Due Process.**

Importantly, the issue on the table is whether Plaintiffs must be permitted a meaningful hearing, and *not* whether Plaintiffs (or others) should be permitted to recklessly harm others.  That critical observation aside, it is also true that the vast majority of Ohioans continue to work for "essential" businesses and there is

16

no chaos in such places.  Indeed, the Department of Health itself makes numerous exceptions to the Stay at Home Order, often for businesses that are less "essential" or safe than Plaintiffs or many others.

Further, the State could continue to require and enforce social distancing rules in opened "non-essential businesses," i.e. by *directly* rather than *indirectly* regulating health issues.  Moreover, offering up a meaningful hearing imposes an immense public benefit by permitting the renewal of Ohioans' economic and constitutional rights while harming nobody:  in fact, the State already provides hearings for disputes arising under its Stay at Home Order; it simply refuses to provide such hearing to *Plaintiffs and other Ohio businesses.*  See *Mariemont Apartment Assn. v. Vill. of Mariemont,* 2007-Ohio-173, ¶ 49 ("The village in this case does have significant interests in regulating rental property and its attendant problems, in requiring safe housing, and in maintaining the community's aesthetics.  Nevertheless, those interests are not served by the failure to provide for a prompt appeal process . . . Further, since due process requires an appeal process, specifying a time for a hearing does not pose an undue additional administrative or financial burden").

*Finally*, even if the Director's prohibition on non-essential business is enjoined, nothing would stop the state's proper policymaking branch of government, the Ohio General Assembly, from deliberatively but immediately legislating a more coherent set of quarantine rules that would no doubt account for the constitutional rights while simultaneously protecting the public.  This balance is common in legislation, and can be achieved as it has been through litigation.  See *Planned Parenthood Sw. Ohio Region v. Hodges,* 138 F. Supp. 3d 948, 950–61 (S.D. Ohio 2015)(the Director's position that the issuance of an injunction would present health and safety risks . . . But at this time, the connection between the denial of the variance and the health and safety concerns is tenuous . . . Given the temporary nature of the relief, the Court finds that the harm to women seeking abortion services outweighs the more theoretical harm to the patients' health and safety at this time").

Indeed, multiple courts within this Circuit have now balances these factors and concluded that constitutional rights must be preserved as against the pandemic. *ON FIRE CHRISTIAN CENTER, INC. PLAINTIFF v. GREG FISCHER, et al. DEFENDANTS*, No. 3:20-CV-264-JRW, 2020 WL 1820249, at 9–10

(W.D. Ky. Apr. 11, 2020); *Preterm-Cleveland v. Attorney Gen. of Ohio*, No. 1:19-cv-00360, slip op. at 2-3 (S.D. Ohio Mar. 30, 2020)(affirmed by the Sixth Circuit Court of Appeals in Case No. 20-3365, Doc. 23-1).

### III. CONCLUSION

Plaintiffs and so many other Ohio business owners and employees imminently face absolute decimation or criminal penalties.  It is a decimation that they do not deserve.  And it is a decimation that could have been avoided had the Director of the Department of Health's Order simply provided constitutionally-required Procedural Due Process, whereby many of these businesses could have established that they are in fact "essential" and are in fact capable of safely operating.  Because it lacks any opportunity for any hearing whatsoever, the Department of Health and its agents must be enjoined from enforcing the Director's April 2, 2020 "Amended Director's Stay at Home Order," insofar as that order provides that "non-essential business must cease" without providing the Due Process required by the Fifth and Fourteenth Amendments to the United States Constitution.

At minimum, such relief must be afforded to Plaintiffs; however, it is difficult to imagine a justifiable basis for providing procedural guarantees to Plaintiffs alone.

Respectfully submitted,

*/s/ Maurice A. Thompson*
Maurice A. Thompson (0078548)
1851 Center for Constitutional Law
122 E. Main Street
Columbus, Ohio 43215
Tel: (614) 340-9817
*MThompson@OhioConstitution.org*

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on Defendants, through email to Defendants' Counsel, on **April 16, 2020**

Respectfully submitted,
/s/ _Maurice A. Thompson
Maurice A. Thompson (0078548)
