# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| TANYA RUTNER HARTMAN, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Case No. 2:20-cv-1952 |
| | : | |
| AMY ACTON, *in her official capacity as* | : | Chief Judge Algenon L. Marbley |
| DIRECTOR of the OHIO DEPARTMENT | : | |
| OF HEALTH, | : | |
| | : | |
| Defendant. | : | |

---

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

---

Respectfully submitted,

**DAVE YOST (0056290)**
**Ohio Attorney General**


 /s/ *Katherine J. Bockbrader*
KATHERINE J. BOCKBRADER (0066472)
WILLIAM C. GREENE (0059230)
Assistant Attorneys General
Ohio Attorney General's Office
Health & Human Services Section
30 East Broad Street, 26th Floor
Columbus, OH  43215
Telephone:  (614) 466-8600
Facsimile:  (866) 805-6094
Katherine.Bockbrader@ohioattorneygeneral.gov
William.Greene@ohioattorneygeneral.gov

*Counsel for Defendant Director Amy Acton*

**Table of Contents**

I.     INTRODUCTION ........................................................................................................1

II.    BACKGROUND ........................................................................................................6

    A.    The COVID-19 pandemic ..............................................................................6

    B.    Tanya Rutner Hartman and Gilded Social, LLC ....................................10

III.   STANDARD OF REVIEW .....................................................................................13

IV.   SUMMARY OF ARGUMENT ................................................................................14

V.    LAW AND ARGUMENT ........................................................................................18

    A,    Plaintiffs lack standing to bring claims on behalf of third parties. ........18

    B.    The Court lacks jurisdiction of Plaintiffs' state law claims...................19

    C.    Plaintiffs have no substantial likelihood of success on the merits.........19

        1.    Neither the statute delegating authority to the Ohio Deptartment of Health or Dr. Actons' amended order is unconstitutionally vague. ...........................................................19

        2.    Dr. Action's amended order does not violate due process.......................22

        3.    Plaintiffs have not demonstrated that they will suffer irreparable injury absent the temporary restraining order.........................32

        4.    Granting the injunction would harm third parties and the public interest.............................................................................34

VI.   CONCLUSION.......................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abbott*,
    No. 20-50264, 2020 U.S. App. LEXIS 10893 (5th Cir. Apr. 7, 2020) ...................................29

*Alessandro v. Beshear*,
    E. D. Ky. No. 3:20-cv-00023 (issued April 3, 2020) .................................................................29

*Basicomputer Corp. v. Scott*,
    973 F.2d 507 (6th Cir. 1992) ...................................................................................................33

*Bell v. Ohio State Univ.*,
    351 F.3d 240 (6th Cir. 2003) ...................................................................................................26

*Binford v. Sununu*,
    New Hamp. Sup. Ct. No 217-2020-cv-00152 (issued March 25, 2020) ...............................29

*Brautigam v. Pastoor*,
    No. 1:16-cv-1141, 2018 U.S. Dist. LEXIS 139774 (S.D. Ohio Aug. 17, 2018) ...................32

*Brown v. Norwalk City Sch. Dist. Bd. of Educ.*,
    No. 3:10 cv 687, 2011 U.S. LEXIS 135926 (N.D. Ohio Nov. 28, 2011) ...............................24

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985)..................................................................................................................24

*Craigmiles v. Giles*,
    312 F.3d 220 (6th Cir. 2002) ...................................................................................................31

*Damon's Rests., Inc. v. Eileen K Inc.*,
    461 F. Supp.2d 607 (S.D. Ohio Nov. 13, 2006) .....................................................................14

*Déjà vu of Cincinnati, LLC v. Union Twp. Bd. Of Trustees*,
    411 F.3d 777 (6th Cir. 2005) (en banc) ..................................................................................20

*Experimental Holdings, Inc. v. Farris*,
    503 F.3d 514 (6th Cir. 2007) ............................................................................................15, 19

*FDIC v. Mallen*,
    486 U.S. 230 (1988)..................................................................................................................24

*Hickox v. Christie*,
    205 F. Supp. 3d 579 (D.N.J. 2016) .........................................................................................28

*Honeywell, Inc. v. Brewer-Garrett Co.,*
   145 F.3d 1331 (6th Cir. 1998) ...................................................................14

*Ind. Land Co., LLC v. City of Greenwood,*
   378 F.3d 705 (7th Cir. 2004) ....................................................................25

*J. W. Hampton, Jr., & Co.* v. *United States,*
   276 U.S. 394 (1928)...................................................................................21

*Jacobson v. Commonwealth of Massachusetts,*
   197 U.S. 11, 25 S.Ct. 358 (1905)..................................................... *passim*

*Kentucky v Graham,*
   473 U.S. 159 (1985)...................................................................................15

*Krimstock v. Kelly,*
   464 F.3d 246 (2d Cir. 2006) .....................................................................24

*Leary v. Daeschner,*
   228 F.3d 729 (6th Cir. 2000) .............................................................13, 15

*Lifter v. Cleveland State Univ.,*
   707 Fed. Appx 355 (6th Cir. 2017)...........................................................18

*Lochner v. New York,*
   198 U.S. 45 (1905).....................................................................................31

*Marshall v. Ohio University,*
   No. 2:15-cv-775, 2015 U.S. Dist. LEXIS 31272, 2015 WL 1179955 (S.D.
   Ohio Mar. 13, 2015)..................................................................................13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. E.F. Hutton & Co.,*
   403 F. Supp. 336 (E.D. Mich. 1975)........................................................32

*Michael v. Ghee,*
   498 F.3d 372 (6th Cir. 2007) ....................................................................21

*Minaf v. Geren,*
   553 U.S. 674 (2008)...........................................................................13, 15

*Ogden v. Gibbons,*
   22 U.S. 1, 6 L.Ed. 23 (1824)......................................................................6

*Overstreet v. Lexington-Fayette Urban County Gov't,*
   305 F.3d 566 (6th Cir. 2002) ....................................................................13

*Pennhurst State Sch. & Hosp. v. Halderman,*
   465 U.S. 89 (1984).....................................................................................19

*Performance Unlimited v. Questar Publishers,*
    52 F.3d 1373 (6th Cir. 1995) ...................................................................33

*Plain Dealer Publ. Co. v. Cleveland Typographical Union,*
    520 F.2d 1220 (6th Cir. 1975) .................................................................14

*Platt v. Bd. Of Comm'rs on Grievs. & Discipline of the Ohio Supreme Court,*
    894 F.3d 235 (6th Cir. 2018) ...................................................................20

*Puckett v. Lexington-Fayette Urban Cnty. Govt.,*
    833 F.3d 590 (6th Cir. 2016) ..............................................................26, 27

*Simon v. Cook,*
    261 F. App'x 873 (6th Cir. 2008) .......................................................16, 20

*Smith v. Jefferson County Bd. of School Comm'rs,*
    641 F.3d 197 (6th Cir. 2011) .......................................16, 24, 25, 26

*Touby v. United States,*
    500 U.S. 160, 111 S. Ct. 1752 (1991) .....................................................21

*Tucker Anthony Realty Corp. v. Schlesinger,*
    888 F.2d 969 (2nd Cir. 1989) .................................................................32

*United States v. James Daniel Good Real Prop.,*
    510 U.S. 43 (1993) ...................................................................................24

*United States v. Lantaz,*
    No. CR-2-08-015, 2009 U.S. Dist. LEXIS 39653 (S.D. Ohio Apr. 22, 2009) ........................20

*Warth v. Seldin,*
    422 U.S. 490 (1975) ..........................................................................15, 18

*Williamson v. Lee,*
    348 U.S. 483 (1955) .................................................................................28

*Winder v. NRDC, Inc.,*
    555 U.S. 7 (2008) .....................................................................................13

*Zinermon v. Burch,*
    494 U.S. 113 (1990) .................................................................................24

**Statutes**

Ohio Rev. Code 3701.352 ...............................................................8, 9, 28

Ohio Revised Code 3701.13 ...........................................................*passim*

Ohio Revised Code 3701.13 and 3701.352 ...............................................28

iv

Ohio Revised Code Section 119.03 ................................................................................19

Ohio Revised Code Section 3701.13 ......................................................................20, 34

**Other Authorities**

Fourteenth Amendment ...............................................................................................31

Due Process Clause.................................................................................................20, 31

Proc. No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020).................................................8

U.S. Constitution Eleventh Amendment.........................................................15, 19, 21

## I.      INTRODUCTION

The United States Supreme Court held almost 200 years ago that, "[T]he power of States to enact and enforce quarantine laws for the safety and the protection of the health of their inhabitants . . . is beyond question." *Ogden v. Gibbons*, 22 U.S. 1, 6 L.Ed. 23 (1824).  States may "enact quarantine laws and health laws **of every description**." *Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11, 25, 25 S.Ct. 358 (1905) (emphasis added).

Plaintiffs now challenge this nearly 200 year-old history of federal endorsement of state emergency action and seek to enjoin a lawfully-issued order of the Ohio Department of Health, which expires on May 1, 2020, so that their bridal shop can immediately supplement its online business with in-person dress fittings, sales, and social activities.  The Court should deny Plaintiffs' request.  Plaintiffs lack standing to raise several of their claims and the Court lacks jurisdiction over Plaintiffs' state-law claims.  Plaintiffs' remaining claims fail to pass the four-part test applicable to requests for injunctive relief.  They have no likelihood success on the merits, Plaintiffs have failed to present more than the most conclusory evidence of an irreparable injury, let alone clear and convincing evidence.  Finally, the risk of harm to third parties and the public is so great that Plaintiffs have not even attempted to argue that those factors support the issuance of an injunction.

For these reasons, the Court should deny Plaintiffs' request for a temporary restraining order.

## II.      BACKGROUND

### A.      The COVID-19 pandemic

The novel coronavirus named COVID-19, which is caused by a new strain of coronavirus that had not been previously identified in humans, is a respiratory disease that can result in serious

illness or death.[1]  First identified in Wuhan, China in late 2019, COVID-19 has since spread across the globe with rapid speed, reaching almost every nation and all 50 of the United States.[2]  The rapid spread is due to the virus being easily transmissible and transmissible by asymptomatic carriers, which means that infected people can spread the virus without knowing it.[3]  The virus has an incubation period of up to 14 days, during which "[i]nfected individuals produce a large quantity of virus . . . , are mobile, and carry on usual activities, contributing to the spread of infection."[4] The virus can remain on surfaces for many days, and patients may remain infectious for weeks after their symptoms subside.[5]

On March 11, 2020, the World Health Organization (WHO) officially declared COVID-19 to be a pandemic.[6]  "A pandemic is a global outbreak of disease."[7]  Pandemics result from the emergence of new viruses, as the lack of "pre-existing immunity" facilitates worldwide spread. *Id*.  Over the past century, four pandemics have occurred as a result of influenza viruses, but this is the first known pandemic to be caused by a coronavirus.  *Id*.

---

[1]    Centers for Disease Control and Prevention, What You Need to Know About Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[2]    WORLD HEALTH ORGANIZATION, ROLLING UPDATES ON CORONAVIRUS DISEASE (COVID-19),   https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (last updated April 3, 2020).

[3]    WORLD HEALTH ORGANIZATION, CORONAVIRUS DISEASE 2019 (COVID-19) SITUATION REPORT – 73, (April 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2.

[4]    David L. Heymann, *COVID-19: What is Next for Public Health?*, 395 THE LANCET 542, 543 (2020).

[5]    WORLD HEALTH ORGANIZATION, Q&A ON CORONAVIRUSES *(COVID-19)*, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses.

[6]    WORLD HEALTH ORGANIZATION, CORONAVIRUS DISEASE 2019 (COVID-19) SITUATION REPORT – *51*, (March 11, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_10.

[7]    Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Situation Summary, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html

On March 13, 2020, U.S. President Donald Trump declared a national emergency due to the outbreak of COVID-19 in the United States, citing the WHO's pandemic designation and 1,645 cases in the United States.[8] As of March 31, 2020, less than three weeks after the declaration of national emergency, the Center for Disease Control ("CDC") reported COVID-19 exists in every state in the U.S. with 186,101 cases and 2,860 deaths.[9] As of April 14, 2020, the CDC reported in the U.S. 632,548 cases and 31,071 deaths.[10] The World Health Organization reports that as of April 16, 2020 worldwide there are 2,034,802 confirmed cases, 135,163 confirmed deaths.[11]

An Ohio statute, Ohio Revised Code 3701.13, gives the Director of the Ohio Department of Health very broad authority during health crises like the COVID-19 one:

> The department of health shall have supervision of all matters relating to the preservation of the life and health of the people and have ultimate authority in matters of quarantine and isolation, which it may declare and enforce, when neither exists, and modify, relax, or abolish, when either has been established.
>
> * * *
>
> The department may make special or standing orders or rules…for preventing the spread of contagious or infectious diseases[.]

Ohio Rev. Code 3701.13. And violations of such orders are prohibited:

> No person shall violate any rule the director of health or department of health adopts or any order the director or department of health issues under this chapter to prevent a threat to the public caused by a pandemic, epidemic, or bioterrorism event.

Ohio Rev. Code 3701.352.

---

[8]    Proc. No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020).

[9]    Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases in U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[10]   Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases in U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

[11]   https://www.who.int/emergencies/diseases/novel-coronavirus-2019

As provided in these statutes, Ohio Department of Health Director Dr. Amy Acton has issued multiple orders to mitigate the spread of COVID-19.[12]  The relevant order here is the Amended Stay at Home Order issued on April 2, 2020 ("Amended Order").  Ex. 1 to Compl. These mitigation efforts decreased the spread of the COVID-19 in Ohio.  Without mitigation, it was projected that Ohio would have had 62,000 cases per day by March 23, 2020.[13]  However, due to these orders, as of April 16, 2020, Ohio has 8,239 total confirmed cases, 2,331 hospitalizations, and 389 confirmed deaths.[14]  Approximately 29% of confirmed cases result in hospitalizations and approximately 4% of confirmed cases result in death. *Id.*  Due to Ohio's early and extensive mitigation efforts, has fewer confirmed COVID-19 cases and fewer confirmed COVID-19 deaths than neighboring states.[15]  The Amended Order will expire on May 1, 2020, and the Governor has announced plans to lift restrictions on non-essential businesses beginning on that date.  *See* archives, April 16, 2020 press conference https://ohiochannel.org/collections/governor-mike-dewine.

---

[12]  Declaration of Brian Fowler at ¶ 4.

[13]  Declaration of Brian Fowler at ¶ 3.

[14]  Declaration of Brian Fowler at ¶ 2.

[15]  Washington Post, Did Ohio get it right, early intervention, Preparation for pandemic may pay off, https://www.washingtonpost.com/national/health-science/did-ohio-get-it-right-early-intervention-preparation-for-pandemic-may-pay-off/2020/04/09/7570bfea-7a4f-11ea-9bee-c5bf9d2e3288_story.html

There are a total of 46 states have also ordered non-essential businesses to close.[16]  In addition to Ohio, this includes South Carolina,[17] New York,[18] Connecticut,[19] Pennsylvania,[20] Kentucky,[21] and Michigan.[22]

## B. Tanya Rutner Hartman and Gilded Social, LLC

Tanya Rutner Hartman owns and operates Gilded Social, L.L.C. ("Gilded Social"), which is a dress shop located in Columbus, Ohio.  (Compl.  ¶¶9-10.)  Gilded Social was incorporated with the Ohio Secretary of State on November 28, 2017.  (*Id*. at ¶10; Ex. A, https://bizimage.ohiosos.gov/api/image/pdf/201733201788 (Ohio Secretary of State, Gilded Social's Articles of Incorporation)).  It is a for-profit limited liability company.  (Ex. A.)  Gilded Social opened for business on March 1, 2018.  (Ex. B, https://www.facebook.com/events/1482349955220998/ (Facebook Grand Opening Celebration).) Gilded Social has three employees:  Mrs. Hartman, a director of sales, and a director of operations. (Ex. C, https://www.shopgildedsocial.com/about.)

---

[16]     ABC News, Here are the states that have shutdown nonessential businesses, https://abcnews.go.com/Health/states-shut-essential-businesses-map/story?id=69770806
[17]     South Carolina Office of the Governor Henry McMaster, Gov. Henry McMasters Orders Non-Essential Businesses Closed Throughout S.C.,
[18]     Governor Andrew M. Cuomo press release, Gov. Cuomo Issues Guidance on Essential Services Under The "New York State on Pause" Executive Order, https://www.governor.ny.gov/news/governor-cuomo-issues-guidance-essential-services-under-new-york-state-pause-executive-order
[19]     Ct.gov Connecticut's Official State Website, Suspension of non-essential in-person business operations, https://portal.ct.gov/Coronavirus/Pages/Suspension-of-Non-Essential-In-Person-Business-Operations
[20]     Fox 29 News Philadelphia, Wolf Orders Shutdown of all Non-Essential Businesses in Pennsylvania, https://www.fox29.com/news/wolf-orders-shutdown-of-all-non-essential-businesses-in-pennsylvania
[21]     Louisville Courier Journal, Gov. Beshear orders "nonessential retail businesses to close. What that includes, https://www.courier-journal.com/story/news/local/2020/03/22/kentucky-coronavirus-beshear-orders-nonessential-businesses-close/2895931001/
[22]     Michigan.gov The Office of Gretchen Whitmer, Executive Order 2020-21 (COVID-19), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html

Gilded Social is located on the second floor of 65 East Gay Street, Columbus, Ohio. (Ex. D, https://www.shopgildedsocial.com/.) Its space includes a small waiting room, several dressing rooms, a common lounge space, storage space for its more than 1,200 samples. (Ex. E, https://www.shopgildedsocial.com/space-rental-inquiry-form?rq=rental.; Ex. I, https://www.shopgildedsocial.com/blog/so-youve-scheduled-your-initial-dress-shopping-appointment; Ex. J, https://www.shopgildedsocial.com/the-top-ten-reasons-why-you-should-buy-with-us.)

Gilded Social sells special order dresses that can be ordered in-store or online. Gilded Social's designers' collection can be viewed on its website, Instagram page, and its designers' websites. Ex. I; Ex. M, https://www.shopgildedsocial.com/blog/what-to-know-before-you-come-in-to-purchase-your-bridesmaid-dress. Gilded Socials website provides the following advice to its customers regarding the deadline for ordering:

- Brides with September, October, and November 2020 weddings cannot and should not wait until the end of this restricted period to order their bridesmaids' dresses! As such, we are committed to continuing our order process in the most flexible way possible.

  - Please Note: If the deadline for ordering your dress for an upcoming Fall wedding is between now and the end of April, don't miss it!. The deadlines are calculated to ensure that the dress arrives in plenty of time for the wedding and delaying ordering during this restricted period may jeopardize that.

(Ex. L.) Despite this April deadline, Gilded Social acknowledges that designers' estimated ship dates are typically 12-14 weeks out. (Ex. L.)

Gilded Social also has hundreds of sample size and consignment dresses available for purchase in its store. (Ex. H, https://www.shopgildedsocial.com/sample-sale-dress-index; Ex. J, https://www.shopgildedsocial.com/the-top-ten-reasons-why-you-should-buy-with-us.) Dresses can be marked for pick up and held until Gilded Social reopens, or it will ship the items to its

customers.  (Ex. H.)  Special order dresses can be purchased in store or online.  (Ex. J.)  Additionally, for its sample size and consignment dresses, Gilded Social offers a Home Try On service.  (Ex. H, https://www.shopgildedsocial.com/sample-sale-dress-index.)  Gilded Social will deliver three customer-chosen dresses to its customer and wait while the customer tries them on. (*Id.*)  The customer can purchase any of the three dresses and the delivery is free.  (*Id.*)  If the customer doesn't want any of the dresses, they are charged a $25 delivery fee that can be used toward a future purchase.  (*Id.*)

Appointments can be made for a bride and members of her bridal party.  (Ex. G, https://www.shopgildedsocial.com/praise).  Customers are encouraged to "bring a little bubbly to celebrate." (Ex. I.)  Appointments are 90 minutes and are "often … scheduled back-to-back." (*Id.*)  Since it does not "have a large waiting area," Gilded Social recommends that if customers arrive early they "have a quick beverage or snack" at a neighboring restaurant. (Ex. I, https://www.shopgildedsocial.com/blog/so-youve-scheduled-your-initial-dress-shopping-appointment.)

In addition to selling dresses, Gilded Social has an online shop where its customers can purchase gift cards and accessories such as emergency kit, lint removing sheets, oil blotting tissues, jewelry (such as earrings, bracelets, and necklaces), cocktail mixers, cocktail kits, bottle openers, candlesticks and confetti poppers.  (Ex. P; Ex. K, https://www.shopgildedsocial.com/gift-card-order-form.)

Gilded Social also rents out its space for wedding day preparations.   (Ex. E, https://www.shopgildedsocial.com/space-rental-inquiry-form.)   Space rentals include a make-your-own-mimosa bar, and Gilded Social's staff helps with set up, hosting, and clean up.  (*Id.*)  Brides can bring their own wedding professionals to the space, such as wedding planners, hair and

12

makeup      artists,      photographers,      and      videographers.         (Ex.       E,
https://www.shopgildedsocial.com/space-rental-inquiry-form.)  The pre-wedding party can bring
food and beverages or Gilded Social will arrange for a neighboring business to cater the event.
(*Id*.)

Gilded Social holds events throughout the year.  It has a sample sale scheduled for May 6,
2020 through May 17, 2020.  Ex. O, https://www.shopgildedsocial.com/events.   Plaintiffs'
Verified Complaint states that it is an appointment-only business, but its website states that no
appointments are needed during the sample sale.  Id.

## III.    STANDARD OF REVIEW

The issuance of a temporary restraining order is an extraordinary and drastic remedy, which
may only be awarded upon a clear showing that the movant is entitled to such relief.  *Winder v.
NRDC, Inc.*, 555 U.S. 7, 22 (2008), *citing Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  As
such, the party seeking such a remedy must clearly establish that (1) it is likely to succeed on the
merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the
issuance of a temporary restraining order would not cause substantial harm to others; and (4) the
injunction is in the public interest.  *See Minaf v. Geren*, 553 U.S. 674, 689-90 (2008).  *See also
Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

The movant also bears the burden of establishing the entitlement to a temporary restraining
order "an extraordinary remedy which should be granted only if the movant carries his or her
burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette
Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (emphasis in original).  The party seeking
a preliminary injunction must establish its entitlement by clear and convincing evidence.  *Marshall
v. Ohio University*, No. 2:15-cv-775, 2015 U.S. Dist. LEXIS 31272, at *10 2015 WL 1179955

(S.D. Ohio Mar. 13, 2015), *citing Overstreet*; *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331 (6th Cir. 1998). To meet its burden, the movant's evidence "must more than outweigh the [opposing] evidence," but must also "persuade the court that [the] claims are highly probable." *Damon's Rests., Inc. v. Eileen K Inc.*, 461 F. Supp.2d 607, 621 (S.D. Ohio Nov. 13, 2006).

In this case, Plaintiffs have failed to establish a clear showing that these four factors are met. In particular, Plaintiffs have failed to establish it has any significant likelihood of succeeding on the merits of their case against Health Director Dr. Amy Acton, much less demonstrate the "strong showing of probable success at trial" that is required. *Plain Dealer Publ. Co. v. Cleveland Typographical Union*, 520 F.2d 1220, 1223 (6th Cir. 1975). They also cannot satisfy the remaining three factors. For these reasons, Plaintiffs' Motion for Temporary Restraining Order must be denied.

**IV.    SUMMARY OF ARGUMENT**

Given the clear and officially declared public health emergency presented by the COVID-19 virus, Defendant, Dr. Amy Acton, Director of the Ohio Department of Health, exercising her broad public-health-related statutory powers, issued orders aimed at slowing the spread of this pernicious disease to protect the public health by saving lives, most directly by preventing our healthcare system from being overwhelmed by the spike in cases that experts predicted would occur absent aggressive, widespread mitigation efforts. Ohio's mitigation efforts have been deemed very successful thus far.

Plaintiffs, a Columbus-based dress shop (with an established online presence) and its owner, have sued Dr. Acton, seeking, among other things, to enjoin the continued enforcement of those orders. Plaintiffs, arguing that now is a critical season in the wedding industry, wrongly arguing that they have been deprived of their right to due process—namely, a hearing to challenge

the claimed deprivation of the right to operate their business in the usual manner during this public health crisis. They claim that they would be able to open their storefront safely and in compliance with certain protective measures, even though their advertised methods of doing business would seem to make that questionable. Plaintiffs also incorrectly claim that Dr. Acton's orders are void for vagueness, even though Plaintiffs concede that they understand how the orders apply to them. Further, Plaintiffs improperly seek money damages against the state of Ohio, despite the fact that such damages are barred by the Eleventh Amendment to the U.S. Constitution. See *Kentucky v Graham*, 473 U.S. 159, 169 (1985).

Of immediate concern is Plaintiffs' motion for a temporary restraining order. The Court should deny the motion, as Plaintiffs fail to meet the test for a temporary restraining order by any standard, much less by the required clear and convincing evidence. Plaintiffs try to vindicate claimed rights of *other* people and businesses, but they lack standing to succeed in that attempt, and therefore the Court could not grant relief to Plaintiffs on that basis. See *Warth v. Seldin*, 422 U.S. 490, 449 (1975). Nor does the Court have jurisdiction over Plaintiffs' state-law claims or—as noted above—over their claims for money damages. See *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 520-21 (6th Cir. 2007); *Kentucky v. Graham, supra*. Finally, Plaintiffs fail the four-part test for a temporary restraining order on any of their other claims. They cannot establish a likelihood of success on the merits, irreparable harm caused by the orders, or a public benefit or lack of harm to third parties if their motion were granted. *See Minaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (discussing the elements for a temporary restraining order).

Plaintiffs cannot successfully show that Dr. Acton's statutory authority or orders are void for vagueness. They admit that they understand their position with respect to the orders, which means they know how to conform their conduct to the law. *Simon v. Cook,* 261 F. App'x 873, 882 (6th Cir. 2008).

Plaintiffs also cannot successfully demonstrate that they are entitled to a hearing based on a deprivation of a property interest, as they claim. Dr. Acton's generally-applicable orders are legislative acts, and as such they do not even arguably trigger due-process hearing rights. See *Smith v. Jefferson County Bd. of School Comm'rs*, 641 F.3d 197, 216 (6th Cir. 2011). Regardless, there is no right to operate a business in Ohio free of any inconvenient constraints. Whatever right Plaintiffs enjoy under Ohio law (the source of any claimed property interests relevant here) necessarily comes with the limitations that are embedded (and apparent) in Ohio law itself. Given the public health emergency and the authority vested in Dr. Acton by the General Assembly, the effects of Dr. Acton's orders on Plaintiffs' business do not infringe on any constitutionally-protected property interest enjoyed by Plaintiffs.

The upshot of Plaintiffs' theory is that Ohio can *never* take aggressive, disease-mitigation actions that will have a temporary negative effect on Ohioans' normal ways of living and doing business, regardless of how necessary those actions might be to preserve lives and protect public safety in general. Obviously, there would be no way Ohio could offer a hearing to every non-essential business in Ohio (or even to a modest percentage of Ohio's considerable population of business owners).

Nor have Plaintiffs supported their bare assertions of likely irreparable harm from Dr. Acton's orders. They offer no evidence that allowing the orders to remain in effect for another two weeks will cause their business to suffer in light of the general changes made by Ohio's population

in postponing weddings. Plaintiffs have not provided any evidence about their economic situation, much less tied that evidence to their status as a non-essential business. Nor have they shown why they could not be sufficiently sustained by their considerable online services, which include available video contact with customers. Plaintiffs have this failed to carry their burden on the irreparable-injury prong of the test for a temporary restraining order.

Finally, it is clear that granting the requested injunction would harm third parties and the public interest, and that it would do so in ways that unquestionably outweigh any temporary drop in business experienced by Plaintiffs. Plaintiffs do not even address these prongs of the test for a temporary restraining order, and it is easy to see why. It hardly needs to be said that a fast-spreading, severe, and often fatal illness that not only directly threatens many lives but also indirectly threatens others by having the potential to overwhelm the healthcare system makes it imperative that Ohio be able to slow down the spread of COVID-19 . Indeed, regarding Plaintiffs' understandable economic worries, it would be awfully difficult for Ohio's businesses to survive if large numbers of Ohioans became sick over a short period.

For these reasons, as further explained below, the Court should deny Plaintiffs' motion for a temporary restraining order.

## V.    LAW AND ARGUMENT

### A.    Plaintiffs lack standing to bring claims on behalf of third parties.

Plaintiffs seek:1) a declaration that the order is unconstitutional "as applied to a class of Ohio businesses not previously subject" to regulation by the Ohio Department of Health; 2) an injunction prohibiting actions against "a class of similarly situated business owners[;]" and 3) an injunction prohibiting action against unspecified "others."  *See* Complaint, pp. 13-14.  These claims fail because Plaintiffs lack standing to seek relief on behalf of unrelated third parties.  A "plaintiff generally must assert his own rights and legal interests, and cannot sue to protect the rights of third parties.  *Warth v. Seldin*, 422 U.S. 490, 449 (1975); *Lifter v. Cleveland State Univ*., 707 Fed. Appx 355, 365 (6th Cir. 2017).

Although there are exceptions to this general prohibition about asserting the rights of third parties, those exceptions are not met here.  In order for an individual[23] to sue on behalf of another, she must prove a close relationship between herself and the third party whose rights she is asserting, and a hinderance preventing the third party from raising her own claim.  *Lifter*, 707 Fed. Appx. at 365.  Plaintiffs have not even alleged these elements and the allegations indicate they could never be met.  Plaintiffs could never credibly allege a "close relationship" between themselves and every other business in Ohio not previously subject to regulation by the Ohio Department of Health, "similarly situated" businesses, or "others."  The first two relationships are necessarily arm's-length business relationships and the third is so nebulous as to be meaningless in this context.

For these reasons, the Court should not award relief to any third party not before the Court.

---

[23] Because Plaintiffs are not, and could not credibly, assert organization standing, we have not addressed that issue.  Obviously, organizational standing presents separate issues, with a separate body of case law that is inapplicable here.

**B.     The Court lacks jurisdiction of Plaintiffs' state law claims.**

This Court lacks jurisdiction over Plaintiffs' state law claims and claims for damages due to sovereign immunity.  The Eleventh Amendment precludes a federal court from ruling against a State or its officials on the basis of state law.  *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 520-21 (6th Cir. 2007).  "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

Plaintiffs' Complaint includes allegations that are violations of state, rather than federal law.  Plaintiffs assert a claim of a violation of due process under both the United States and Ohio Constitution.  Compl.  at 7.  Plaintiffs also allege that Dr. Acton failed to comply with the procedure for emergency rules under Ohio Revised Code Section 119.03.  Compl.  ¶ 30.  Much of Plaintiffs' motion discusses assertions that Dr. Acton improperly infringed on the Ohio General Assembly's legislative authority.  Pls.' Mot. at 12-13.  To the extent that Plaintiff alleges that Dr. Acton lacks statutory authority to implement the Amended Order or failed to comply with Ohio law, Plaintiffs have alleged a state law claim over which this Court has no jurisdiction.

**C.     Plaintiffs have no substantial likelihood of success on the merits**

Plaintiffs claim that the Dr. Acton's order is unconstitutional because it is vague and violates procedural due process, and impermissibly delegates authority to the Ohio Department of Health.  All of these claims fail on their merits.

**1.     Neither the statute delegating authority to the Ohio Deptartment of Health or Dr. Acton's Amended Order is unconstitutionally vague.**

The Department of Health's determination of a business' "essentiality" is not vague merely because Plaintiffs disagree with the decision.  Complaint, ¶42 (ECF 1).  " '[A] law fails to meet

the requirements of the Due Process Clause if it so vague and standardless that it leaves the public uncertain as to the conduct it prohibits….' " *Simon v. Cook,* 261 F. App'x 873, 882 (6th Cir. 2008) (quoting *Giacco v. Pennsylvania,* 382 U.S. 399, 402-403 (1966)).  "A statute is void for vagueness if it does not give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement." *United States v. Lantaz,* No. CR-2-08-015, 2009 U.S. Dist. LEXIS 39653 (S.D. Ohio Apr. 22, 2009) (citing *United States v. Halter,* 259 F. App'x 738 (6th Cir. 2008)).  Here, Plaintiffs allege that both the underlying statute, Ohio Revised Code Section 3701.13, and the Director's Amended Order are vague.  Complaint, ¶42-46 (Amended Order) (ECF 1); Complaint, ¶47-49 (statute) (ECF 1).

In assessing vagueness, a court must look to the words of the statute itself.  *Platt v. Bd. Of Comm'rs on Grievs. & Discipline of the Ohio Supreme Court,* 894 F.3d 235, 247 (6th Cir. 2018). If a word's common meaning " 'provides adequate notice of the prohibited conduct, the statute's failure to define the term will not render the statute void for vagueness.' " *Id.* (quoting *United States v. Hollern,* 366 F. App'x 609, 612 (6th Cir. 2010)).   And, "where the challenged language 'is commonly used in both legal and common parlance,' it will often be 'sufficiently clear so that a reasonable person can understand its meaning." *Id.* (citing *Déjà vu of Cincinnati, LLC v. Union Twp. Bd. Of Trustees,* 411 F.3d 777, 798 (6th Cir. 2005) (en banc)).

The language of the Ohio Revised Code 3701.13 sufficiently clear.  It states that the "department of health shall have supervision of all matters relating to the preservation of the life and health of the people and have ultimate authority in matters of quarantine and isolation, which it may declare and enforce, when neither exists, and modify, relax, or abolish, when either has been established."  Ohio Rev. Code 3701.13.  The department of health "may make special or standing Amended Orders * * * for preventing the spread of contagious or infectious diseases."

*Id*.  Plaintiffs point to nothing in the statute that is vague, such that a person of ordinary intelligence cannot determine the authority of the Director regarding quarantines.

Instead, Plaintiffs contend that the broad authority granted to the Department of Health in Ohio Revised Code 3701.13 as the "ultimate authority" over quarantine Amended Orders is an improper delegation of legislative authority to another branch of government, the Executive Branch  Plaintiffs asserts federal and state claims here, but the General Assembly's authority to delegate is governed by the Ohio Constitution, not the United States Constitution.  *Michael v. Ghee*, 498 F.3d 372, 375 (6th Cir. 2007).  To the extent Plaintiffs are asserting a violation of the Ohio Constitution, her claim is barred by the Eleventh Amendment, as discussed above.  Even if the claim were not barred, the nondelegation doctrine does not prevent legislatures from seeking assistance, within proper limits, from other branches of government.  *Touby v. United States*, 500 U.S. 160, 164, 111 S. Ct. 1752, 1755 (1991).  Nor does a legislature violate the nondelegation doctrine "merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors."  *Id*.  Instead, the legislature must simply provide an "intelligible principle to which the person or body authorized to [act] is directed to conform."  *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U.S. 394, 409 (1928).

Here, Plaintiffs claim that the delegation of "ultimate authority in matters of quarantine and isolation" to the Director of Health renders Ohio Revised Code 3701.13 unconstitutional. Complaint, ¶ 47 (ECF 1).  The General Assembly granted such authority so that the Director could act quickly to preserve the life and health of people and to prevent the spread of contagious disease. Ohio Rev. Code 3701.13.  There can be no real contention that the standards in Ohio Rev. Code 3701.13 don't include an "intelligible principle" that limits the Director's authority in an emergency situation.

Plaintiffs also allege that the Amended Order is vague.  This argument fails because Plaintiffs are not arguing that they cannot determine whether the order applies to them.  Plaintiffs simply disagree with the concluion that their business is non-essential.  The Amended Order does not provide a "definition" of essential businesses (e.g., "a business that is necessary for people to survive") that Plaintiffs must interpret; rather it provides a detailed list of the businesses that are considered Essential Business Operations (grocery stores, hardware stores, gas stations, etc.).  Ex. 2 to Comp., Amended Order at 5-8.  Clothing stores are not listed.

It seems apparent that Plaintiffs have determined they are not an Essential Business Operation under the Amended Order.  When their attorney contacted the local health department, his email stated that his client, who owns a bridal shop, "is not classified as 'essential' by the Health Department's Order, but would like to operate, or present evidence that it could safely operate."  *See* Ex. 3 to Comp.  In other words, Plaintiffs simply think it's unfair that bridal stores were not listed in the Amended Order.  Plaintiffs have determined which side of the line they are on--they just do not agree with where it was drawn.  The problem is not an issue of vagueness.  For these reasons, Plaintiffs' void for vagueness argument is not likely to succeed.

## 2.  Dr. Action's amended order does not violate due process.

Plaintiffs' due process claim is also unlikely to succeed.  When faced with a public health crisis—such as the deadly COVID-19 pandemic currently expanding not just across the U.S. but across the whole world—States have broad powers to issue orders aimed at mitigating the spread of the disease. See *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 (1905). Because such orders will often need to be issued both quickly and in an abundance of caution, of necessity they need not be perfect or perfectly precise in their impacts. These types of orders will be struck down only if they have "no real or substantial relation" to protecting public health.  *Id.* at 31.

There were multiple reports of devastation wrought by the COVID-19 disease on individuals afflicted with it.  Ohio officials also saw the projected high rate of community transmission in Ohio in the absence of government-ordered mitigation efforts. See footnote 13, above. Ohio officials saw modeling showing that, unmitigated, the fast spread of COVID-19 was capable of completely overwhelming available healthcare facilities, making it impossible to provide adequate care to those who contract it—and Ohio officials learned that many healthcare workers in hard-hit locations had become ill themselves while trying to care for their highly-contagious patients. See Fowler declaration at ¶ 2, 3. Ohio's modeling predicted that the same would happen in Ohio if steps were not taken to mitigate the spread and "flatten the curve" (i.e., prevent an overwhelming spike in cases). See Fowler declaration ¶¶ 2,3,4. The federal government itself declared a national public health emergency on January 31, 2020.  (Amended Order at 11, Ex. 2 to Compl.)  The World Health Organization declared COVID-19 a pandemic on March 11, 2020.  (Amended Order at 12, Ex. 2 to Compl.)

In response to this dire situation, Dr. Acton issued orders under the authority of Ohio Revised Code 3701.13.  The orders were issued to in an attempt to slow the spread of COVID-19 so that fewer people in Ohio would get sick and so that the healthcare facilities would not be so overwhelmed that even *more* people would die simply due to inadequate or unavailable medical attention. See Fowler declaration at ¶ 3. Among other things, the Director's orders prohibited large gatherings; required schools to close temporarily; required businesses deemed nonessential to close temporarily; and required essential business that remained open to operate with certain safety precautions to protect the health of the employees and customers and, ultimately, the public (by reducing the spread of the virus). See Amended Order at 1, 9, 13. Many Ohioans began working from home.  Various courts issued orders to address the situation. Hearings and oral arguments

were postponed or even canceled, and *even speedy-trial rights* were temporarily suspended by this Court, and other courts, in light of the health crisis. See S. D. Ohio Gen. Order No. 20-05 (issued March 20, 2020); *see also* https://www.paulhastings.com/about-us/advice-for-businesses-in-dealing-with-the-expanding-coronavirus-events/u.s.-court-closings-cancellations-and-restrictions-due-to-covid-19.

Plaintiffs were not entitled to a due process hearing. The cases that Plaintiffs cite requiring a hearing involve individual deprivations of liberty or property interests, such as termination of employment or seizure of property. (Pls. Mot. at 9-10.) *See Krimstock v. Kelly*, 464 F.3d 246, 255 (2d Cir. 2006) (seized vehicle); *United States v. James Daniel Good Real Prop.,* 510 U.S. 43, 56 (1993) (criminal forfeiture of real estate); *FDIC v. Mallen,* 486 U.S. 230, 242 (1988) (suspending director of bank); *Zinermon v. Burch,* 494 U.S. 113, 125-26 (1990) (admission to mental hospital); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 (1985) (termination of employment). No individual action has been taken against Plaintiffs, however. Rather, a statewide order was issued of general application to all Ohioans. No property was seized from Plaintiffs and no individual determination was made about their rights. No due process hearing right arises from this type of general action.

The Sixth Circuit has held that "[n]o notice or hearing is required before legislative action." *Smith v. Jefferson County Bd. of School Comm'rs*, 641 F.3d 197, 216 (6th Cir. 2011); *see also Brown v. Norwalk City Sch. Dist. Bd. of Educ.,* No. 3:10 cv 687, 2011 U.S. LEXIS 135926, at *8 (N.D. Ohio Nov. 28, 2011) (statute and rules prohibiting employment of a felon did not give rise to hearing rights). In *Brown,* the district court held that an employee was not entitled to a hearing when he lost his job because of newly enacted statutes and rules that prohibited employment of a felon. *See* 2011 U.S. LEXIS 135926, at *8. The court found that the law was one of general

24

application, and that no hearing rights arise from a legislative action. The Amended Order is similarly of general application. Although the Amended Order is not a statute, in this context, the Sixth Circuit has made clear that a "legislative action" need not be a statute, or an action of a state legislature.

The Sixth Circuit in *Smith* rejected "formalistic distinctions" between legislative, adjudicatory, or administrative actions. *See* 641 F.3d at 216. Rather, the court held that the determination of whether an act is legislative depends on the nature of the act. *Id.* (citing *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998)). The determination turns on the type of decision and whether it is of general application. "[L]egislation normally is general in its scope rather than targeted on a specific individual." *Id.* at 216 (citing *Ind. Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004)).

In *Smith*, the action at issue was a decision by a school board to eliminate an alternative school. *Id.* The court found this decision to be legislative in nature. *Id.* The court noted that the school board made a generally applicable budgetary decision after weighing its priorities. *Id.* at 217. Similarly, Dr. Acton weighed the danger from the spread of COVID-19 with the need of Ohioans to obtain necessary goods and services, and issued an order designating essential and non-essential businesses. The Amended Order is an action of general application, not an action targeted to a specific individual.

When a governmental action is of general application, "its generality provides a safeguard that is a substitute for procedural protections. The greater the number of people burdened by a proposed law, the easier it is to mobilize political resistance," and the more likely it is that the government will react to opposition to the action. *Ind. Land Co.,* 378 F.3d at 710. Accordingly, no notice and hearing are necessary.

Although the Amended Order is not a statute or rule, Ohioans still have the opportunity to influence the State's response to the COVID-19 pandemic. The General Assembly created the statute giving the Director of ODH the authority to enact laws in response to a public health emergency. Ohio's General Assembly also passed comprehensive legislation, H. B. 197, in response to the COVID-19 pandemic and the economic consequences of the Amended Order. Ohioans can influence the legislature's decisions about its response to the pandemic. Dr. Acton is appointed by the Governor, and he could take appropriate action if he did not agree with her decisions. Ohioans can put political pressure on the Governor to direct or encourage Dr. Acton to rescind or modify her orders. Indeed, some Ohioans have loudly protested the State's pandemic restrictions. The Governor has made clear in daily press conferences, however, that he supported the Amended Order. *See* archives, https://ohiochannel.org/collections/governor-mike-dewine.

The Amended Order is a legislative act of general application. Most property interests entitled to procedural due process may be restricted or even abolished by the legislature. *Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 2003). A State can make general policy decisions to restrict certain categories of businesses without affording a right to due process to every business affected. *Smith*, 641 F.3d at 216. The Amended Order is an order of general application and does not give rise to any due process right to a hearing. This Court should therefore reject Plaintiffs' due process claim.

Even if the Amended Order were not a legislative act, Plaintiffs still would not be entitled to a due-process hearing. Procedural due process is the right to notice and a meaningful opportunity to be heard. See, *e.g.*, *Puckett v. Lexington-Fayette Urban Cnty. Govt.*, 833 F.3d 590, 606 (6th Cir. 2016). A person claiming a property interest is, constitutionally speaking, entitled to notice and a hearing regarding any deprivation only if she has a *constitutionally-protected* property interest.

26

See *id*. at 604-605. Such property interests are derived, not from the Constitution, but from independent sources of law, such as state law. See *id*. at 605. Therefore, whatever property interest Plaintiffs claim to have that might entitle them to a hearing would—in this case—have to be a property interest derived from Ohio law.

The property interest Plaintiffs appear to assert here is the right to conduct their business as usual even during a public health emergency like the COVID-19 pandemic, free from any temporary restrictions issued by the Director of the Ohio Department of Health. See, *e.g*., Complaint at ¶ 63. It is this claimed right that Plaintiffs must believe they have been deprived of, because no one permanently shut their business down, and the Director's orders were issued only because it was an effective way to slow down this deadly pandemic and prevent our healthcare system from being overwhelmed (and thus unable to respond effectively to the needs of very sick Ohioans).

Plaintiffs do not have a constitutionally-protected right to operate free of orders like the ones referenced in the Complaint. In Ohio, businesses necessarily operate within the regulatory framework put in place by the General Assembly. They are subject to many limitations found in Ohio statutes. They must adhere to any applicable sanitation laws, licensing laws, tax laws, zoning laws, and health laws, just to name a few.

As noted above, Ohio Revised Code 3701.13, gives the Director of the Ohio Department of Health very broad authority:

> The department of health shall have supervision of all matters relating to the preservation of the life and health of the people and have ultimate authority in matters of quarantine and isolation, which it may declare and enforce, when neither exists, and modify, relax, or abolish, when either has been established.
> * * *
>
> The department may make special or standing orders or rules…for preventing the spread of contagious or infectious diseases[.]

27

Ohio Rev. Code 3701.13. And violations of such orders are prohibited pursuant to Ohio Revised Code 3701.352.

Because any right Plaintiffs have to run their business is based on Ohio law, that right is subject to any accompanying limitations placed on that right by Ohio law. As discussed above, the Health Department statutes, Ohio Revised Code 3701.13 and 3701.352, are such limitations, and Plaintiffs take their business-operation rights subject to those restrictions. The Supreme Court has recognized that states have broad authority to regulate professions even in the absence of a public health emergency. *See Williamson v. Lee*, 348 U.S. 483, 487 (1955). Plaintiffs do not possess an absolute right to operate their business however they normally do regardless of orders issued by the Director under Ohio Revised Code 3701.13.

> "The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others. It is then liberty regulated by law."

*Jacobson*, 197 U.S. at 26-27, quoting *Crowley v. Christensen*, 137 U.S. 86, 89 (1890).

Even where there is an arguable due-process right, the right is not absolute. "'[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Hickox v. Christie,* 205 F. Supp. 3d 579, 601 (D.N.J. 2016) (quoting *Matthews v. Eldridge*, 424 U.S. 319, 334-345 (1976). "[U]nder the pressure of great dangers," liberty may be reasonably restricted "as the safety of the general public may demand." *Jacobson*, 197 U.S. at 29.

In *Jacobson,* the Supreme Court upheld a mandatory vaccination law. *Id.* The Court explained that the "liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. . . . . Rather, a

28

community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27 (internal quotations omitted).

In the midst of this pandemic, courts have recognized the broad authority and need for states to issue public health orders in response to the threat of COVID-19. In *In re Abbott*, No. 20-50264, 2020 U.S. App. LEXIS 10893, *4 (5th Cir. Apr. 7, 2020), the Fifth Circuit upheld the State of Texas's public health order issued in response to the COVID-19 pandemic. The *Abbott* court held, "That settled rule allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home." *Id*. The court held that the district court erred in granting a TRO against the State and substituting the district court's judgment regarding the efficacy of the State's order. *Id. Abbott* held that, "'[i]t is no part of the function of a court' to decide which measures are 'likely to be the most effective for the protection of the public against disease.'" *Id.* (quoting *Jacobson*, 197 U.S. at 30). Other courts have also declined to enjoin state's responses to the COVID-19 epidemic. *See, e.g., Alessandro v. Beshear,* E. D. Ky. No. 3:20-cv-00023 (issued April 3, 2020); *Binford v. Sununu*, New Hamp. Sup. Ct. No 217-2020-cv-00152 (issued March 25, 2020).

Plaintiffs allege that the Director's orders violate their procedural due process rights because they are given no right to a hearing to challenge the order to emporarily restrict their business. (Compl. ¶ 64.) According to Plaintiffs, they are entitled to a post-deprivation hearing.[24] (Compl. ¶ 63.) Plaintiffs need a hearing, they claim, in order to have the opportunity to prove that Gilded Social is "essential" after all and/or can operate safely by implementing crowd control,

---

[24] Plaintiffs also complain that it is not fair that, if a hearing were provided, they would bear the burden of showing that they are essential business. (Pls. Mot. at 10-12.) As discussed above, Ohio law provides no hearing here, so it is odd to debate the merits of a proceeding that does not exist. However, if the State brought a civil or criminal action against Plaintiffs, the State would have the burden of proof.

social distancing, and cleaning regimens. (Compl. ¶ 63.) Plaintiffs assert that they have the means to implement these methods, and they also claim that they are actually "essential" after all because, at this time of year, many people planning weddings must order their wedding dresses in order to have them by September and October, which are—according to Plaintiffs—popular months for weddings.[25] (Compl. ¶ 70.) Plaintiffs also claim to be essential because they, their employees, and their landlord derive significant financial benefit from the business generated by Gilded Social. (Comp. ¶ 77.)

Plaintiffs' theory is simply unworkable, not to mention incorrect. Their claims about Gilded Social's value are undoubtedly true of thousands, if not tens of thousands, of Ohio businesses and business owners. Nearly any given business exists to serve customers and provide a living for its owner(s), and many businesses and industries are seasonal. Plaintiffs assert that they and every other nonessential business is entitled to a post-deprivation hearing to challenge the temporary closure of its operations. But obviously that would be physically impossible. Plaintiffs' theory, then, is really a theory that a State is simply not permitted to issue blanket orders temporarily closing businesses (or taking other action that negatively impacts business), because Ohio does not have the resources to provide a hearing to every non-essential business in Ohio.

Plaintiffs say that they are seeking to vindicate merely their right to "operat[e] a business" or "[earn] a living." (Compl. ¶ 53.) They go on to compare the Director's orders to an order revoking an entity's permit to do business or permanently shutting down a particular business. See *id*. at ¶ 54-57. But the Director has not revoked any permits or ordered businesses to be closed permanently, nor has she prohibited Plaintiffs from operating online or generally earning a living.

---

[25] Plaintiffs invoke the constitutional right to marriage and seem to imply that it applies here. Compl. ¶ 72. Plaintiffs have no standing to raise other individuals' right to marry. Moreover, people can get married without purchasing a dress from Plaintiffs or visiting their storefront.

The orders are a *temporary* measure to save lives.   They are not singling out Plaintiffs in order to punish them.

The orders have general application, and *they will work only if they are applied as widely as possible*. If businesses and owners across the State could potentially carve thousands of Swiss-cheese holes in the Director's reasonable attempts to "flatten the curve," the likely result would be a spike in cases, an overwhelmed healthcare system, and many Ohio deaths that could have been avoided. This is exactly why the Director has the authority to issue the orders that she did. Her authority is necessary in times like this, when there is a great and serious danger to the public that, in the opinions of medical and other scientific experts, only well-enforced, widely-applicable physical-distancing orders will mitigate.

It is hard to avoid hearing in Plaintiffs' argument faint echoes of a now-discredited case decided 105 years ago today:  *Lochner v. New York*, 198 U.S. 45 (1905).  Without saying so expressly, the plaintiffs are claiming a *substantive* right to operate their business without being burdened by state laws *they judge* too extreme—a right found nowhere in the Constitution.  But the "Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics."  *Id*. at 75 (Holmes, J., dissenting).  Nor does it entitle every business to emergency orders perfectly tailored to their liking.  To rule for the plaintiffs would mark "a return to *Lochner*," and an approach to constitutional adjudication in which courts "elevate [their] economic theory" and public-health policy "over of that of legislative bodies."  *Craigmiles v. Giles*, 312 F.3d 220, 229 (6th Cir. 2002).

One final point.  *Even if* the State violated the Due Process Clause by failing to provide a hearing on the essential nature of businesses, the remedy for that would be a narrow injunction creating a right to a hearing.  So even if the plaintiffs were correct on their due-process claim, they

31

would not be entitled to the relief they seek:  an order invalidating the Amended Order in its entirety.

For these reasons, Plaintiffs are unlikely to succeed on their due process claims.

> **3.** **Plaintiffs have not demonstrated that they will suffer irreparable injury absent the temporary restraining order.**

To demonstrate show an irreparable injury Plaintiffs must "exhibit a non-compensable injury for which there is no legal measure of damages." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. E.F. Hutton & Co*., 403 F. Supp. 336, 343 (E.D. Mich. 1975) (citations omitted). And the harm must be "'actual and imminent,' and not merely remote or speculative." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2nd Cir. 1989); *see also Brautigam v. Pastoor*, No. 1:16-cv-1141, 2018 U.S. Dist. LEXIS 139774, *20-21 (S.D. Ohio Aug. 17, 2018) *citing Abney v. Amgen, Inc*., 443 F.3d 540, 552 (6th Cir. 2006).

Plaintiffs allege two forms of irreparable injury: 1) the deprivation of Plaintiffs' constitutional rights; and 2) the "virtual certainty" of the closure or bankruptcy of Gilded Social. *See* Plaintiff's Memo (Doc. 2), p. 16.  Both of these claims fail.

Plaintiffs' claims regarding the deprivation of its constitutional rights fail for the reasons discussed above.  Their claims regarding the closure or bankruptcy of Gilded Social fail because Plaintiff has produced no evidence other than bare assertions that allowing Dr. Acton's orders to remain in effect for an additional 14 days will result in the harm claimed or that any drop-off in its business is due to Dr. Actions' orders and not other factors, such as society's willingness to postpone or downsize weddings due to the pandemic. Further, Gilded Social has already been subject to Dr. Acton's orders declaring it non-essential for 25 days and the harm Plaintiffs allege has not yet come to pass.  Plaintiffs have produced no evidence explaining why that harm will occur within the next 14 days.  They have not provided any evidence of the expenses that the

business has incurred, the effect that Dr. Acton's orders have had on its revenues, the business' cash reserves or credit, or the terms of the credit line that allegedly underwrite the Gilded Social. Plaintiffs' website indicates that they are able to provide considerable services online, and that they are actively engaged in providing virtual appointments, video chats, and shipping products, (which they are permitted to do under the Amended Order) yet Plaintiff has provided no evidence about the economics of those activities.

This lack of evidence distinguishes this case from the authorities cited by Plaintiffs. In *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373 (6th Cir. 1995) the court granted a preliminary injunction based on unrebutted evidence about the dollar-value of the plaintiff's lost revenue, the percentage of that loss as a share of the plaintiff's biennial revenues, and the dollar-value of withheld royalties. *See Performance Unlimited*, 52 F.3d at 1381. The case did not state that the "inability to operate a business for an unknown period of time constitutes irreparable harm," as Plaintiffs claim. *See* Plaintiffs' Memo (Doc. 2), p. 16. The second case Plaintiffs cite, *Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir. 1992) was another preliminary injunction case, decided after development of an evidentiary record at a hearing. *Id*. at 512. It granted an injunction because the plaintiff was able to show that the breaching of non-competition and confidentiality covenants caused damages that were difficult to compute. In this case, there is virtually no evidentiary record and no evidence to review. Plaintiffs could have introduced evidence to support their claims, but have chosen not to do so.

A plaintiff's failure to carry its evidentiary burden at this stage of the proceedings should always result in the denial of the requested relief, but particularly when, as here, Plaintiffs have had nearly a month to draft their pleadings, and Defendants have had only 24 hours to respond.

### 4. Granting the injunction would harm third parties and the public interest.

If there were ever a case where the harm to third parties and the public interest required denial of an injunction, this is it. One the one hand, Plaintiffs assert a need to have employees, customers, and (presumably) suppliers physically present in their store so that people can "shop for their wedding attire immediately" to get their dresses in time for fall weddings. *See* Complaint, ¶70. On the other hand, Dr. Acton has exercised her authority under Ohio Revise Code Section 3701.13 to temporarily restrict certain activities to help stop the spread of a deadly disease and save the lives of citizens of the state. There should be no question as to which interest is more important.

The COVID-19 virus is a deadly infectious disease. At the time this was written, the virus had infected at least 8,239 people in Ohio and killed 373.[26] Nationally, the toll is much higher. There were 632,220 confirmed cases and 26,930 deaths at the time this was written.[27] If current trends continue, 20 more Ohioans will die by the time the Court reads this memorandum and more than 60 will die by the time the Court hears argument in this case on Monday.[28] Nationally, over 30,000 more people will be infected by Monday and there will be a correspondingly tragic number of deaths. The virus has an incubation period of up to 14 days, during which "[i]nfected individuals produce a large quantity of virus . . . , are mobile, and carry on usual activities, contributing to the spread of infection."[29] The virus can remain on surfaces for many days, and patients may remain

---

[26] *See* https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home (last visited April 16, 2020).
[27] *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited April 16, 2020)
[28] *See* https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home (last visited April 16, 2020).
[29] David L. Heymann, *COVID-19: What is Next for Public Health?*, 395 THE LANCET 542, 543 (2020).

infectious for weeks after their symptoms subside.[30]  Because no one who has not contracted the virus is immune and there is no vaccine, literally every single person in the state could be infected. Dr. Acton's orders are necessary to prevent an explosion of disease that could overwhelm the state's health care system and greatly increase the death toll.  The Ohio Department of Health estimates that Ohio would have seen a peak of 62,000 new COVID-19 cases per day[31] without the Director's orders.  One need only look at reports from other states and other countries to see what even a smaller outbreak would look like.  This is why Dr. Acton and Governor DeWine have repeatedly emphasized the need for temporary business closures and social distancing.  *See* Archived Covid-19 Updates, available at https://www.ohiochannel.org/collections/governor-mike-dewine (last visited April 17, 2020).

Plaintiffs have presented no evidence or made any allegation challenging any of the harms discussed above.  Their memo in support of their Motion makes no attempt to balance the harms to the public and third parties against the harm to Plaintiffs.  And although Plaintiffs' pleadings do not discuss it, their website provides extensive details on how their business can operate while complying with the Director's orders.  Plaintiffs currently operates an on-line store selling jewelry, accessories, and dresses.[32]  Plaintiffs also sell gift cards, offer virtual appointments, video chats with customers, and shipment of sample to customers' homes.[33]  Plaintiffs deliver gowns to customers' houses to try them on and schedule video chats to help customers "properly try

---

[30]  WORLD HEALTH ORGANIZATION, Q&A ON CORONAVIRUSES *(COVID-19)*, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses.
[31]  *See* https://coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards/forecast-model  (last visited April 17, 2020).
[32] *See* Ex. P, Gilded Social website, at https://www.shopgildedsocial.com/online-shop (last visited April 17, 2020); Ex. H, https://www.shopgildedsocial.com/sample-sale-dress-index (last visited April 17, 2020).
[33] *See* Ex. N, Gilded Social website, at https://www.shopgildedsocial.com/schedule-a-virtual-appointment (last visited April 17, 2020).

[clothes] on and answer any questions."[34]  Plaintiffs' website states that these and other measures "will help us stay afloat during this critical time in our history."[35]

Plaintiffs have attempted to minimize the impact of enjoining Dr. Acton's order by stating their business is by appointment only, so they can minimize the number of people in their store. *See* Complaint, ¶78.  But it is clear that Plaintiffs do not intend to do this.  Their website advertises that from May 6, 2020, to May 17, 2020, they are holding a Sample Sale, with "no appointment necessary."[36]  Plaintiffs' website also invites not only customers, but wedding planners/coordinators, hair artists, makeup artists, photographers, and "others."[37]  Customers and others are encouraged to bring their "Gilded Tribe," as well as food and beverages.[38]  This conduct poses a significant risk to the public of illness, death, and collapse of the healthcare system.  The risk far outweighs the burden on Plaintiffs to be subject to the Amended Order until May 1, 2020.

## VI.    CONCLUSION

Balancing the temporary restraining order factors results in a determination that Plaintiffs have failed to meet their burden and establish that they are entitled to a temporary restraining order.  For all of the foregoing reasons, Plaintiffs' motion should be denied and their claims should be dismissed accordingly.

---

[34] *Id.*
[35] *See* Gilded Social Website, at https://www.shopgildedsocial.com/schedule-a-virtual-appointment (last visited April 17, 2020).
[36] *See* Gilded Social website https://www.shopgildedsocial.com/events (last visited April 17, 2020).
[37] *See* Gilded Social website, at https://www.shopgildedsocial.com/space-rental-inquiry-form (last visited April 17, 2020).
[38] *See* Gilded Social website, at https://www.shopgildedsocial.com/pre-wedding-space-rentals (last visited April 17, 2020).

Respectfully submitted,

**DAVE YOST (0056290)**
**Ohio Attorney General**

/s/ *Katherine J. Bockbrader*
KATHERINE J. BOCKBRADER (0066472)
WILLIAM C. GREENE (0059230)
Assistant Attorneys General
Ohio Attorney General's Office
Health & Human Services Section
30 East Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-8600
Facsimile: (866) 805-6094
Katherine.Bockbrader@ohioattorneygeneral.gov
William.Greene@ohioattorneygeneral.gov

*Counsel for Defendant Director Amy Acton*

## CERTIFICATE OF SERVICE

This certifies that the foregoing Defendant's Memorandum in Opposition to Plaintiffs'

Motion for Temporary Restraining Order was filed electronically on April 17, 2020. Notice of

this filing will be sent to all parties by operation of the Court's electronic filing system.


/s/ *Katherine Bockbrader*
Assistant Attorney General

37